## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**EMMETT LARSEN**,

      Applicant,

v.

**RICK RAEMISCH**, Executive Director, Colorado Dept. of Corrections; and
**CYNTHIA COFFMAN**, Attorney General for State of Colorado,

      Respondents.

---

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. §2254

---

Pursuant to 28 U.S.C. §2254, Mr. Larsen petitions this Court for habeas relief and asserts his custody is in violation of the Sixth and Fourteenth Amendments on two separate grounds:

- First, his conviction is not supported by the required jury findings and, thus, violates his right to trial by jury and to due process of law, which requires proof beyond a reasonable doubt of all elements required to support a conviction; and

- Second, the trial court's total exclusion of evidence and limits on cross-examination concerning the government's efforts to take custody of the alleged victims away from their mother during an evening recess in the mother's testimony violated Mr. Larsen's rights to confrontation, to present a defense and to a fair trial.

### A. CONVICTION UNDER ATTACK

1.    The name and location of the court that entered the judgment of conviction:

        El Paso County District Court
        Fourth Judicial District
        270 S. Tejon Street
        Colorado Springs, CO 80903

2.      Judgment of conviction was entered on February 11, 2014.

3.      The case number is El Paso County District Court Case No. 12CR2825.

4.      The court sentenced Mr. Larsen to a mandatory minimum sentence for Sexual
        Assault on a Child-Position of Trust-Pattern of 8 years to life in prison.

5.      Applicant is **not** serving a sentence for a conviction other than the conviction
        challenged in this application.

6.      Nature of the offenses with which applicant was charged: (all counts)

        Count 1:  Sexual Assault on a Child-Position of Trust-Pattern of Sexual Abuse (AH
        alleged victim) [1]
            Count 2:  SAOC-POT (AH alleged victim)
            Count 3:  SAOC-POT (KH alleged victim)

7.      Conviction was entered on Count 1-- SAOC-POT (Pattern)

8.      Mr. Larsen entered a plea of not guilty to all counts.

9.      There was a jury trial.  The jury acquitted Mr. Larsen of Count 3, and the court
        merged Count 2 into Count 1.

10.     Mr. Larsen did not testify.


## B.      DIRECT APPEAL

1.      Mr. Larsen filed a timely direct appeal in the Colorado Court of Appeals ("CCOA")
        in *People v. Larsen,* Case No. 14CA487.

2.      Claims raised on direct appeal were as follows:

        (i).     Defendant was denied his due process right to a fair trial and a trial by an
                 impartial jury when the trial court refused the defense request to poll the jury
                 when highly prejudicial material was published in the local newspaper;

---

[1] For brevity's sake, this petition will refer to the offense of Sexual Assault on a Child by One
in a Position of Trust-Pattern of Sexual Abuse as "SAOC-POT-(Pattern)."  Sexual Assault on
a Child by One in a Position of Trust without a pattern will be referred to as "SAOC-POT."

(ii).    Defendant's rights to confrontation, to present a defense and to a fair trial were violated when the trial court excluded all evidence of efforts by the Department of Human Services ["DHS"] to take custody of the alleged victims away from their mother during a recess in the mother's testimony.

(iii).   Defendant's conviction for SAOC-POT (Pattern) must be vacated because the jury's findings and verdict do not support the factual finding required for conviction of two or more incidents of sexual contact involving the same child.

3.    In an opinion issued November 5, 2015, the CCOA reversed Mr. Larsen's conviction on Ground (i), upheld the trial court's ruling excluding evidence raised in Ground (ii), and declined to reach the issue raised in Ground (iii).  *See* Attachment 1 [*People v. Larsen,* 2015 COA 157 ("*Larsen* 1")].

4.    The state sought certiorari review in the Colorado Supreme Court ("CSC"), and Mr. Larsen filed a contingent cross-petition on Ground (ii).

5.    On June 6, 2016, the CSC granted the state's petition for writ of certiorari and denied Mr. Larsen's contingent cross-petition.

6.    On April 24, 2017, the CSC reversed the CCOA and remanded the matter.  *See* Attachment 2 [*People v. Larsen,* 393 P.3d 543 (Colo. 2017) ("*Larsen 2*")].

7.    On remand on July 20, 2017, the CCOA issued a second opinion, which was unpublished.  In this opinion, the court addressed Ground (iii) and upheld Mr. Larsen's conviction.  *See* Attachment 3 ("*Larsen 3*").

8.    Mr. Larsen filed a timely petition for rehearing in the CCOA.  *See* Attachment 4.  The CCOA denied rehearing, but issued a modified opinion on October 26, 2017.  One judge dissented on rehearing and would have vacated Mr. Larsen's conviction on the ground the jury's verdict did not support the conviction.  *See* Attachment 5.

9.    Mr. Larsen filed a petition for writ of certiorari in the CSC on Ground (iii).

10.   On June 25, 2018, the CSC denied certiorari, with two justices dissenting.[2]  *See* Attachment 6.

---

[2]  Two state supreme court justices would have granted certiorari to decide:  "Whether in light of the plain language of the sentence enhancement statute and *United States v. Alleyne,* 570 U.S. 99 (2013), which requires the jury to find any fact that increases a mandatory minimum sentence, the pattern offense-sentence enhancement count must be vacated since the jury did not find the required two or more acts."

## C.   POSTCONVICTION PROCEEDINGS

Mr. Larsen has filed no postconviction proceedings in the state court.

## E.   EXHAUSTED CLAIMS

Mr. Larsen asserts he is entitled to habeas relief on the following claims, which were fairly presented to the state's highest court.

**Claim One:**   **Mr. Larsen's conviction violates his Sixth Amendment right to a jury trial and Fourteenth Amendment right to due process of law since the jury was not required to find the "two or more acts of sexual contact" required for conviction of the SAOC-POT-(Pattern) offense.  Pursuant to the plain language of Colorado's statute and *United States v. Alleyne*, 570 U.S. 99 (2013), this conviction must be vacated.**

**Support:**   An individual cannot be deprived of liberty without "due process of law," U.S. Const. Amend. XIV. In addition, the constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. Amend. VI. "Taken together, these rights indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" *Apprendi v. New Jersey*, 530 U.S. 466, 476–77 (2000) (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)); *see also In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

The "touchstone" for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an "element" or "ingredient" of the charged offense. *Alleyne*, 570 U.S. at 107–08 (citing *United States v. O'Brien*, 560 U.S. 218 (2010) and

4

*Apprendi, supra* at 483, n. 10)).  "[A] fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed."  *Alleyne supra* (citing *Apprendi, supra*).

As explained in additional detail below at pp.6-8, the existence of "a pattern of sexual abuse," which requires "the commission of two or more incidents of sexual contact involving a child when such offenses are committed by an actor upon the same victim," increases the punishment range for SAOC-POT and mandates a minimum sentence of 8 years to life in prison.  Absent the fact of "a pattern of sexual abuse," SAOC-POT would be punishable by probation or a minimum prison sentence of 1 year to life.  Pursuant to *Alleyne* and *Apprendi,* Mr. Larsen's conviction for SAOC-POT (Pattern) cannot stand absent a jury finding beyond a reasonable doubt of a pattern of sexual abuse.  Here, the jury found only a single act of sexual contact and, thus, the verdict does not support the conviction.

The CCOA, instead of addressing the issue raised--whether the jury's verdict and findings support the required pattern-- ruled there was sufficient evidence to support the required pattern.  *See* Attach. 5 at ecf pp.6-7 (Berger, J., dissenting).  According to the CCOA majority, since there was evidence of three acts, only one of which the jury affirmatively rejected, it is possible that the jury found the required second act, even though no such finding is reflected in the jury's verdict.  *See* Attach.3 at ecf p.9.

The dissenting judge would have reversed Mr. Larsen's conviction because the jury did not make the findings necessary to establish a pattern of sexual abuse. Attach. 5 at ecf p.8. Writing in dissent, Judge Berger noted that:

> [a] fundamental problem infects the majority's modified opinion. The majority decides (correctly) an issue not raised by Larsen but then does not decide the issue actually raised by Larsen.
>
> Larsen does not claim that there is insufficient evidence in the record to support a conviction for sexual assault on a child by one in a position of trust-pattern of abuse. Had he made such an argument, the majority properly rejects it.
>
> The argument that Larsen makes is that the *jury's verdict* itself is insufficient….
>
> Although the majority at least twice recognizes the issue argued by Larsen, it then proceeds to analyze a different question— whether there was sufficient evidence in the record to support a general verdict of guilty on the pattern charge?

Attach. 5 at ecf pp.6-7.

As explained below, a review of the pertinent Colorado statute, the jury instructions, and the jury's verdict, including the jury's response to interrogatories, shows that the jury never found, beyond a reasonable doubt or otherwise, that the prosecution had proven the required pattern of sexual abuse.[3] Absent such a jury finding, Mr. Larsen's conviction cannot stand.

>    1.    The Colorado Statute

Section 18-3-405.3, C.R.S. (2011), the statute pursuant to which the State charged Mr. Larsen in Count 1 with SAOC-POT-(Pattern), provides in pertinent part:

> (1)    Any actor who knowingly subjects another not his or her spouse to any sexual contact commits sexual assault on a child by one in a position of trust if the victim is a child less than eighteen years of age and the actor committing the offense is one in a position of trust with respect to the victim.

---

[3] The jury instructions, jury's verdict and jury's responses to interrogatories can be found in Attachment 4 at ecf pp.11-36.

(2)     Sexual assault on a child by one in a position of trust is a class 3 felony if:

(a) The victim is less than fifteen years of age; or

(b) The actor commits the offense as a part of a pattern of sexual abuse as described in subsection (1) of this section. No specific date or time need be alleged for the pattern of sexual abuse; … The offense charged in the information or indictment shall constitute one of the incidents of sexual contact involving a child necessary to form a pattern of sexual abuse as defined in section 18-3-401(2.5).

* * * *

(4)     If a defendant is convicted of the class 3 felony of sexual assault on a child pursuant to paragraph (b) of subsection (2) of this section, the court shall sentence the defendant in accordance with the provisions of section 18-1.3-406.

SAOC-POT, as defined in subsection (1) of the statute, is a class 4 felony unless it is elevated to a class 3 felony by proof of a factor set forth in subsection (2). The minimum presumptive penalty for a class 4 felony is 2 years; the minimum for a class 3 felony is 4 years. *See* C.R.S. §18-1.3-401(1)(a)(V)(A). However, when an individual is convicted of SAOC-POT-(Pattern), they must be sentenced pursuant to §18-1.3-406, the crime of violence sentencing statute, and are subject to a mandatory minimum sentence of 8 years to life in prison.

    2.    <u>The Pertinent Charges and Conviction</u>

Mr. Larsen was charged, pursuant to the above statute, with two class 3 felonies involving AH. He was charged in Count 1 with SAOC-POT-(Pattern), pursuant to §18-3-405.3(1),(2)(b), and in Count 2 with SAOC-POT-[Child Under 15], pursuant to §18-3-405.3(1),(2)(a). (CF p6-8). Both counts describe class 3 felonies, but only the pattern count, Count 1, requires enhanced sentencing pursuant to §18-1.3-406, the crime of violence sentencing statute.

The jury received a single elemental instruction, one that contained the elements of SAOC-POT. *See* Attach.4 at ecf p.24. There was no separate elemental instruction for the pattern count. The only thing that distinguished Counts 1 and 2 for the jury were the names of the offenses, the verdict forms, and the unanimity instruction. *See id.* at 13, 24, 33-35. The verdict form for Count 1, the pattern count, asked the jury to find if the State had proven beyond a reasonable doubt whether the defendant committed SAOC-POT-(Pattern) by:

> A.    "touching AH's breasts under her shirt" and/or
>
> B.    "touching AH's vaginal area over her underwear."

(CR p235-236; Supp. JI p18).

The jury made two findings. It found:

> (1)    beyond a reasonable doubt that the defendant "did commit Sexual Assault on a Child by One in a Position of Trust—Pattern of Abuse by touching [AH's] breasts under her shirt;" and
>
> (2)    the defendant "did not commit Sexual Assault on a Child by One in a Position of Trust—Pattern of Abuse by touching [AH's] vaginal area over her underwear."

Attach. 4 at ecf p.34.

At sentencing, the court entered judgment on Count 1, merged Count 2 (Child Under 15) into Count 1 (Pattern of Abuse), and sentenced Mr. Larsen on the pattern count to the mandatory minimum sentence of 8 years to life in prison. (CF p309; Tr.2.11.14 p50).

> 2.    The Jury's Verdict Does Not Support the Requisite "Pattern."

Mr. Larsen stands convicted of Count 1, the SAOC-POT-(Pattern) count, but the jury found only a single act of sexual contact. As instructed, the jury was not required to

find more than one act of sexual contact involving AH before convicting Mr. Larsen of this charge. However, for an individual to be properly convicted of SAOC-POT-(Pattern), the jury must unanimously find "two or more" acts of sexual contact involving the same child. *See* C.R.S. §18-3-405.3(1),(2)(b); C.R.S. §18-3-401(2.5). Here, the jury found only a single incident of sexual conduct—"touching AH's breasts under her shirt." As a result, its verdict does not support the charged pattern offense. *See, e.g., Alleyne, supra.*

Mr. Larsen has been denied his right to trial by jury and to due process of law, since the jury did not unanimously decide that the required "two or more incidents of sexual contact" were proven beyond a reasonable doubt. *See* §18-3-401(2.5). Absent jury findings to this effect, Supreme Court precedent requires that Mr. Larsen's conviction be vacated. *See Alleyne, supra; Apprendi, supra; In re Winship, supra.*

**Claim Two:   Mr. Larsen was denied his constitutional rights to confrontation, to present a defense and to a fair trial by the trial court's exclusion of *all* evidence that the Department of Human Services ["DHS"] obtained legal custody of the alleged victims and attempted to remove the children from their mother during the trial.**

**Support:**     Every criminal defendant has a fundamental constitutional right to confront witnesses, to present a defense and to a fair trial. These rights were violated when the trial court excluded all evidence concerning the DHS and a prosecution witness's efforts to remove the alleged victims, Mr. Larsen's granddaughters, AH and KH, from SL, their mother, during the evening recess between the mother's direct testimony and cross-examination. This evidence was highly relevant to the credibility and bias of several witnesses, including the mother, the alleged victim AH, and three prosecution witnesses. These prosecution witnesses were offered to impeach the mother's testimony that (1) she

did not believe her father had sexually touched her children, (2) AH never told her that Mr.

Larsen had touched her breast area before AH made the allegation to DHS, and (3) she had

been threatened by DHS and police with losing her children if she did not tell authorities

exactly what they wanted to hear and participate in a "pretext" call with her father.  The

complete exclusion of this material evidence distorted the truth-seeking function of the trial

and denied Mr. Larsen his right to confront the witnesses, to present evidence in support of

his defense and to a fair trial.

This constitutional error was not harmless.  Mr. Larsen's defense at trial was that he

never touched the girls for a sexual purpose and any touching of the breast area of either girl

was inadvertent.  Significant evidence supported the defense.  For example, Mr. Larsen

arranged counseling for KH when she confided in him that she had been sexually abused for

years while living in California, by a paternal uncle.  It was KH's report of this abuse to her

counselor that led to the DHS interviewing both KH and AH.  Mr. Larsen also facilitated

DHS's initial visit to his home to meet with and interview the girls, and he cooperated fully

with law enforcement.  Given the equivocal and challenged nature of any evidence of sexual

contact, a reasonable jury might have received a significantly different impression of the

mother's credibility, as well as the credibility of several witnesses who testified they never

threatened the mother with losing custody of her children.

Few things could be more impactful to a mother than the government exercising its

power to take away her children.  The court should not have removed this significant

evidence from the jury's view.  Because this claim is best judged in the context of the

equivocal evidence introduced at trial and the excluded evidence, the facts are presented in some detail below.

- <u>Evidence at Trial</u>

In September of 2011, SL was 47 years old and living in California with her nine-year-old twin daughters, AH and KH.  SL had just lost her job of 17 years, and the girls' father had left her.  In addition, KH had recently disclosed that KH's paternal uncle TJ had sexually abused her for years. (Tr.8.15.13:p18; PR-Ex.9-7:25;Ex.10-14:50).  SL decided to move with the girls to Colorado Springs for a new start.  (Tr.8.14.13:p110-111).

The family moved in with SL's retired parents, Emmett and Marlene Larsen, and shared their home for nearly a year.(Tr.8.14.13:p110-111).  Mr. Larsen, a retired FAA employee, provided for SL and her daughters as SL looked for employment.  He used his federal benefits to provide insurance for the girls, each of whom had serious health issues that required ongoing care.(Tr.8.13.13:p182; 8.15.13:p125-26).

KH confided in Mr. Larsen about what happened with TJ.(PR-Ex.12-8:50).  This, along with some behavioral issues KH was experiencing, led Mr. Larsen to obtain counseling for the girl.(8.15.13:p25; PR-Ex.12-8:20).  During one of KH's regular counseling appointments, she disclosed the sexual abuse by TJ in California, and her counselor reported this sexual abuse to authorities. (Tr.8.15.13:p30).

On August 2, 2012, Patricia Hartman, a DHS case manager, visited the Larsens' home to speak with KH about her allegations of sexual abuse by TJ in California.  (Tr.8.15.13:p62-64).  Hartman interviewed the twins separately.  Hartman testified that AH, who all agree has significant memory issues, told her that her grandfather Mr. Larsen

touched her in December of the previous year when she was nine.  According to Hartman,

AH said he touched her twice on her breast area and once on her vaginal area.(*Id.* at 65).

Because SL and her daughters were living with the Larsens, Hartman required SL to

take her daughters immediately to Safe Passage for forensic interviews.  During KH's

interview, she denied any inappropriate touching by Mr. Larsen, but disclosed she was

sexually abused by TJ between the ages of three and seven.  TJ threatened to do something

horrible if KH were to tell.(PR,Ex.9).

AH told her interviewer she was very shy and, though she knew the interviewer

wanted to talk about her grandfather, she was having trouble saying the words.  When asked

if she would be more comfortable writing down what happened, AH said she would and

wrote:

> My grampa tached my in the down part of my boddy and the up
> part dut he did not mean it  it was an asedent  he is nice and fun
> (CR 8.12.13:Def. Ex. B).

AH then told the interviewer she had been touched three times by her grandfather

shortly before her tenth birthday, seven months earlier.  Initially, AH said the first touching

involved her "down part."  When asked if her grandfather had touched her under her

clothes, AH emphatically said, "No, he wouldn't do that. He's my grandpa." (PR,Ex.10-

14:29).  She also claimed her grandfather touched her "up part," the breast area, while she

was sitting at the computer, and described a second incident of breast touching where she

blocked his hands and walked away when it happened.(Id. at 14:17,14:29).[4]

---

[4] The trial court ordered the parties not to question KH or AH about their sexual abuse by
their paternal uncle TJ, but permitted such evidence to come in through the mother and it
was referenced somewhat in the girls' videotaped statements.  (Tr.6.10.13:p.10).

When asked whether "anyone else" had touched her, AH said she did not want to talk about it, "that's like a nightmare coming true."(Tr.8.14.13:p70; PR,Ex.10-14:42). She then told the interviewer it was "me first, then [KH], then we both did it at the same time." AH didn't want "to look in the past."(PR,Ex.10-14:43). She was six when it happened and was happy TJ was in jail, because he did "something very bad to me and my sister. I didn't want to do it, but for a reason." (PR,Ex.10-14:45).

SL was also questioned at Safe Passage. She was very emotional and afraid she might lose her children, though she did not believe her father had been molesting them. (Tr.8.14.13:p140-141; Tr.8.15.13:p55,68-69,81). While there, SL disclosed that she had been sexually touched by her father when she was fifteen.

Police then had SL make a "pretext call" to Mr. Larsen in an effort to "set [him] up" by having him admit to having had sexual contact with the girls. (Tr.8.15.13:p99-101; CF,p70-81; PR.Ex.1). In this call, SL is emotional and stresses her fear that her children are going to be taken from her and discusses any possible touching of the twins by her father. She pleads with him to tell her what had happened, but throughout the call, Mr. Larsen denies ever touching the girls inappropriately and seems genuinely concerned and baffled about how any touching by him of the girls could lead to them being taken from their mother.(CF,p70-81; PR.Ex.1).

Toward the end of the pretext call, SL asks her father why he had molested her, and Mr. Larsen simply says he had explained that to her once. (Id. at 78). SL tells him she is worried that the same thing is happening to her girls, to which Mr. Larsen responded, "Not by me. Not by me." (Id.).

Later the same day, Mr. Larsen agrees to come to the police station to speak with police. (CF,p50-51; Tr.8.15.13:p106-107; PR-Ex.2). Mr. Larsen never denies having touched his granddaughters, but claims that any touching he did was solely in the context of playing with the girls or showing them affection and not for any sexual purpose.  To the extent any specific touching may have left either girl feeling uncomfortable, the defense asserted that feeling was due to the girls' sensitivities and backgrounds and was not a result of their grandfather touching either girl with any sexual motivation.

Mr. Larsen spoke with police for over two hours. (PR,Ex.2).  Consistent with his statements to SL on the pretext call, Mr. Larsen seemed perplexed that any touching he did of his granddaughters could be a concern.  His primary motivation throughout the interrogation seemed to be his desire that the authorities not separate the girls from their mother, because of the damaging effects it would have on all three.(Id.; CR-Ex. 5-30-12 p48; PR-Ex.12-46:45,48:20).  When asked repeatedly whether he had felt at least some small level of sexual gratification in touching the girls, he denies it.(CR-Ex.5-30-12 p68; PR-Ex.12-1:06:30). Mr. Larsen did admit touching SL when she was fifteen.  He agreed that this was his greatest regret in life, but steadfastly denied engaging in the same behavior with the twins.  In fact, he told police he was trying to make up for his past mistakes by helping his granddaughters.  (CR-Ex. 5-30-12 p48; PR.Ex.12).

At trial, KH testified, contrary to what she said during her forensic interview, that her grandfather touched her breast once.(Tr.8.13.14 p170-171,181).  AH described an act of breast touching, but did not remember her grandfather ever touching her vaginal area. (Tr.8.14.13:p28-29,32).  The jury found Mr. Larsen not guilty of any sexual contact with KH,

and it affirmatively rejected a finding of sexual contact based on the touching of the clothing over AH's vaginal area.(CF,p235-238).  The single touching the jury found beyond a reasonable doubt was a brief touching of AH's breasts under her shirt.(CF,p236).

- <u>Trial testimony leading up to DHS and prosecution witness Hartman obtaining legal custody of the children, confronting their mother, and attempting to take custody of the children in the middle of the mother's trial testimony.</u>

As it relates to DHS's actions and the excluded evidence, KH and AH both testified they had been staying at their grandfather's house off and on during the summer, including during the trial. (Tr.8.13.13:p176,186; Tr.8.14.13:p24,41,43,45).  This evidence tended to suggest that the girls' mother trusted her father with the girls and the girls themselves were comfortable around him.  (Tr.8.13.14 p146,175).  There was no evidence that Mr. Larsen's continuing support of his daughter's family was intended to influence anyone's testimony.

SL testified for the prosecution at the end of the second day of evidence. (Tr.8.14.13:p109-146).  She confirmed the girls had stayed with her parents before and during the trial.(Tr.8.14.13:p121).  Her adult son, the girls' brother, had recently died, and the twins were having more contact with their grandparents because they "have been going through a really bad time." (Id. at 120,149).  SL would not have left the children alone with her father if she thought the girls were in any danger of being molested.(Tr.8.15.13:p48). During her direct testimony, SL denied that AH had told her about any touching by Mr. Larsen before the DHS interview on August 2.  (Tr.: 8.14.13:p123).  SL testified that she learned of the allegations by AH only after caseworker Patricia Hartman told her.(Tr. 8.14.13:p139).  According to SL, AH subsequently talked to her about Mr. Larsen having

touched her breasts, but never talked about being touched near her vaginal area.(Tr. 8.14.13:p123-124).

The prosecutor repeatedly attempted to impeach SL through the use of unrecorded alleged prior inconsistent statements and suggested that AH had, in fact, told SL about both types of touching before the girls were interviewed by authorities on August 2.(Tr. 8.14.13:p126,131,133-134,139-140).  The prosecution, thus, sought to corroborate AH's statements that she had told her mother about any touching by her grandfather before telling DHS.

The prosecutor also asked SL whether she had told Detective Dabb on August 2 that she thought "it was [her] fault and that [she was] in denial of what happened." (Tr.8.15.13:p50). SL did not remember having said any such thing, and Detective Dabb, who subsequently testified, was not asked about SL having made this purported statement.(Tr.8.15.13:p78-92).

- <u>Evidence Excluded by the Trial Court</u>

At the end of SL's direct testimony on a Wednesday afternoon, the jury was released and the court ordered SL to return the next morning for cross-examination. (Tr.8.14.13:p146). After SL left, the prosecutor raised the fact that Mr. Larsen was having continuing contact with his granddaughters, and she believed this was a violation of bond conditions for him to have any contact with the girls.(*Id.* at 146-147).  In fact, there was no "no-contact" order, and Mr. Larsen was violating no law or court order by allowing SL and the girls to stay at his home.(*Id.* at 147-149,152; Tr.8.15.13:p5).  Nevertheless, the prosecutor stated she was concerned "about witnesses … staying at the defendant's house during this case.  I don't

know if there is anything that can be done about it, but I have a concern about safety as well as the influence.  I just wanted to raise my concern on the record." (Tr.8.14.13:p151).

The trial judge indicated that he understood the prosecutor's concern and noted that the children had been staying with their grandfather for some time.(*Id.* at 151-52).  Although he was "somewhat taken aback" when he learned that the children were staying with Mr. Larsen, the trial judge stated he was "not inclined to do anything.  [He thought] that the children have been through enough, and [he was] not going to make any orders concerning that."  (Tr.8.14.13:p152).

Despite the trial court's efforts to maintain the status quo, the DHS obtained a custody order from a magistrate judge, even though the trial judge had jurisdiction and had presided over the initial dependency and neglect action involving SL and her children. (Tr.8.12.13:p12-13; Tr.8.15.13:p7).  Patricia Hartman, the DHS caseworker and a prosecution witness, took the custody order to SL's home during the evening recess, confronted SL and unsuccessfully attempted to take physical custody of the girls whom she could not find.(Tr.8.15.13:p7-8).  SL told Hartman she was "making a big mistake" by taking this action.  She said her girls had not been sexually abused by Mr. Larsen and "you all took everything the wrong way."  SL told Hartman that everything she had said in the last investigation she was forced to say and that she was under emotional duress.(CR-Ex. 2-11-14-Ex. A).

The next morning, the prosecutor informed the court that DHS had tried to remove the children from SL the previous night; and the prosecutor did not believe SL was returning to court as she was late and was not returning calls.  (Tr.8.15.13:p4). The prosecutor stated

SL had called and "was saying things like … this was the nastiest thing that [the prosecutor] could have done and things like that, indicating she thinks that [the prosecutor] was somehow involved in this." (*Id.* at 6-7). The prosecutor told the court that she did not think that SL "really trusts this process." (*Id.* at 7).

Although there was initial concern that SL would not return to testify, she arrived in court approximately thirty minutes late, and the court told the jury SL was late because she had "inadvertently overslept." (Tr.8.14.13:p146); Tr. 8.15.13:p16). There is no colloquy on the record, however, as to the reason(s) why SL may have been late.

In light of the evening's events, defense counsel informed the court that he anticipated asking SL about what had happened and thought that she might need counsel in light of possible child abuse charges. (Tr.8.15.13:p10-11). The court ordered the defense "not to go into that" and not to "cross-examine in that area." (*Id.* at 11). Defense counsel strenuously objected, citing *Davis v. Alaska*, 415 U.S. 308 (1974). Counsel stressed the importance of cross-examining SL about what had happened and asserted that the court's ruling would deny Mr. Larsen his "state and federal constitutional right under the due process clause to present a defense and the right to counsel [and] to cross-examine appropriately." (*Id.* at 11-12).

The court refused to allow any inquiry at all about what had happened overnight, telling counsel, "I want you to assume you had finished your cross examination yesterday afternoon before anything happened last night. Anything that was fair game yesterday afternoon, you may inquire into. Anything that happened after [SL left the witness stand] last night is off limits." (*Id.* at 13). The court gave no reasons for excluding this evidence.

(*Id.* at 13,48,49,59,86-87).  The court also instructed SL directly that "We will not be discussing anything about what happened last night.  I am not allowing either attorney to question you about anything that happened after our recess." (*Id.* at 15-16).

Defense counsel's renewed requests to ask about DHS's mid-trial efforts to take the children and DHS's interactions with SL before he cross-examined Hartman and Detective Dabb were summarily denied. ( *Id.* at 48,49, 59, 86-87).

- Applicable Law and Analysis

Criminal defendants have the fundamental constitutional right to confront and cross-examine adverse witnesses presented against them at trial.  *E.g., Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); U.S. Const., amends. VI and XIV.  The right to confrontation and cross-examination is also essential to secure the constitutional right to a fair trial with effective assistance of counsel.  *See Pointer v. Texas*, 380 U.S. 400, 403-405 (1965); U.S. Const., amends. V, VI, XIV.  Likewise, criminal defendants have a constitutional right to present a defense, which implicates their due process right to a fair trial. *See, e.g., Crane v. Kentucky*, 476 U.S. 683 (1986).

Mr. Larsen's rights were violated by the trial court's order excluding all evidence of DHS's confrontation with SL during the recess after her direct testimony.  The court's order required everyone to pretend it was still Wednesday afternoon and that the significant events of that evening had not happened.  By excluding all evidence of DHS's mid-trial efforts to take custody of AH and KH, the trial court denied Mr. Larsen his right to cross-examination and to present evidence that would have, for example:

(1) assisted the jury in assessing SL's credibility;

(2) explained why SL's demeanor and attitude toward the prosecutor changed overnight;

(3) tended to show (i) how real and serious SL's fears were that if she did not do exactly what DHS wanted and/or the prosecution believed she should do, she would lose her children and (ii) how that genuine fear could have influenced her testimony and her prior statements to authorities;

(4) challenged DHS case manager Hartman's testimony that she had not threatened SL to take custody of the girls on August 2, the day the girls were first interviewed, and suggested an institutional bias so strong that DHS and Hartman would unilaterally risk influencing SL's trial testimony and interfering with Mr. Larsen's right to a fair trial;

(5) challenge Detective Dabb's testimony that he did not threaten SL with taking her children or misperceive what SL had said to him about AH having previously told her about any touching by her grandfather; and

(6) challenged Officer Arndt's testimony refuting SL's testimony that she had no choice but to make the pretext call to her father because Arndt threatened her and told her it was the only way to keep her children.(*Id.* at 39-40,101-102).

No doubt SL's demeanor on the stand was likely impacted by DHS's actions the previous evening to take away her children.  The jury, kept in the dark about the traumatic events that occurred between SL's direct testimony and cross-examination, may have misinterpreted the significance of her changed demeanor and responses while testifying.  For example, on redirect, the prosecutor asked SL whether she "remembered testifying yesterday?" and SL responded "[n]ot really."  (Tr.8.15.13:p50).  On the surface such an

exchange would tend to bolster the State's theory that SL was uncooperative and minimizing her father's actions toward her own children.  However, if the jury had known that the DHS had just obtained legal custody of her children, confronted SL over the evening recess for the express purpose of taking her children away from her, and SL believed the examining prosecutor was responsible for this, the inferences drawn by the jury could have been much more favorable to the defense.  The jury could have been swayed by SL's overarching concern for her children and weighed more heavily her testimony that she would never leave her children with her father if she thought they were at risk.

The excluded evidence that the DHS had confronted SL with an order to take custody of her children tends to make clear how justified SL's fear was that DHS would take her children if she did not go along with the prosecution effort to convict Mr. Larsen.  In addition, the court's ruling resulted in suppressing SL's exculpatory statements to DHS that there had been no abuse and that the authorities had taken everything the wrong way.

By suppressing any evidence relating to DHS's mid-trial efforts to take custody of KH and AH from their mother, the trial court's ruling distorted the truth-seeking function of the trial.  This excluded evidence would have placed the testimony of several witnesses in their true light and, thus, assisted the jury in reliably gauging the witnesses' credibility and reliably weighing the evidence.   This was too close a case to suppress such critical evidence. Evidence that would have put the bias, motives and testimony of critical witnesses, e.g., SL and caseworker Hartman, in their true light.

## F.  PRIOR APPLICATIONS

There have been no prior applications in federal court challenging the conviction under attack in this action.

## G. TIMELINESS OF APPLICATION

Mr. Larsen's 28 U.S.C. §2254 petition is timely.  The CSC denied certiorari in his direct appeal on June 25, 2018.  This application has been filed well within the time allowed by 28 U.S.C. §2244(b)(2)(A).

## G. OTHER CONVICTIONS

Mr. Larsen, who is 83 years old, has never been charged with or convicted of any type of offense before the conviction in this case.

## H. LEGAL REPRESENTATION

1.    List the names and address, if known, of each attorney who has represented the applicant in proceedings regarding the conviction under attack:

    A.    Preliminary hearing, arraignment, trial and sentencing:

        Philip A. Cherner
        (now retired)

    B.    Direct Appeal

        Kathleen A. Lord
        1544 Race Street
        Denver, CO 80206

# I. REQUEST FOR RELIEF

Applicant Emmett Larsen asks this Court to grant his request for habeas relief.

LORD LAW FIRM, LLC

*/s/ Kathleen A. Lord*
_____
KATHLEEN A. LORD
1544 Race Street
Denver, Colorado 80206
(303) 394-3302
email address: kathleen@klordlaw.com